Thank you, Your Honors, and may it please the Court, I am Sri Srinivasan, appearing on behalf of Defendants Appellees Rio Tinto. This case bears no nexus to the United States, involving claims against a foreign company based on its association with a foreign government's treatment of its own citizens in its own territory. These circumstances squarely implicate the Supreme Court's admonition in the Sosa decision to engage in vigilant doorkeeping and exercise great caution before recognizing common law causes of action under the Alien Tort Statute. For three reasons, we would respectfully submit that the Court should not permit the claims in this case to proceed. First, the Alien Tort Statute does not support actions based on associations between a foreign company and a foreign government and foreign citizens on foreign soil. Second, as the Second Circuit concluded last week, the Alien Tort Statute does not support claims premised upon corporate liability. And third, even if the Alien Tort Statute is assumed to encompass claims arising overseas and involving a foreign company and foreign citizens in foreign territory, at the very least, the general requirement in our national law and the congressional requirement in the Torture Victims Protection Act to exhaust claims in the local forum should be held to apply in the circumstances of this case. With respect to the first consideration concerning whether the Alien Tort Statute encompasses claims arising overseas and involving the interaction between a foreign company and a foreign government on foreign soil, the Supreme Court's directive in Sosa at pages 727 and 728 indicate that the Court should exercise great caution before recognizing causes of action in those circumstances because of the real potential for engendering international friction. And that real potential was borne out in an analogous situation where Belgium purported to allow claims based on universal jurisdiction, even concerning claims that had no nexus whatsoever with Belgium. What's your argument? Is it that there's not a Jews-Kogan norm that's recognizable under the Alien Tort Statute? Is it political question? Is it active state? What's the legal hook that you're arguing in your first argument? With respect to this argument, Your Honor, the legal hook is that the common law cause of action shouldn't encompass this set of circumstances. It's incumbent upon the Court to fashion a common law cause of action in these situations. And the question of the law... Are you calling the war crimes claim a common law cause of action? No. The war – the war – crimes against humanity, war crimes, and race discrimination are norms. They're international law norms that are alleged to be violated. And the question for this Court is whether it should fashion a common law cause of action to afford a remedy for violation of those norms. You're not – although this was previously couched as an extraterritoriality argument, that's not what you're arguing. You're not arguing it based on the set of cases that deal with extraterritoriality of American statutes. I think those cases reinforce the submission that we're making today, Your Honor. You wouldn't have to reach the conclusion whether the Alien Tort Statute never applies in any extraterritorial situation whatsoever. That is our first-order submission, is what the United States argues. But you wouldn't have to reach that conclusion. I think what you'd have to do – what you could do instead to resolve this case is to conclude at the very least it doesn't apply extraterritorially where the claim concerns the interactions between a foreign company, a foreign government, and foreign soil and foreign citizens. Counsel, I realize that you prevail if we adopt the Second Circuit view that a corporation cannot be a defendant under the Alien Tort Statute. Correct. However, just in case we decide to articulate a rule that says more than that, what do you think the rule should be? You said that common law action shouldn't encompass this sort of case, and I didn't know what the antecedent of this was. What should the rule be? This case is where there's no nexus with the United States because the claim concerns a foreign company's interactions with a foreign government's treatment of its own citizens on its own soil. That's the principle that we would put forward that's sufficient to resolve this case, and Your Honor is correct, it would resolve the case in our favor. And we think it's grounded in SOSA. It's also grounded in the history of the Alien Tort Statute because of the Supreme Court elaborated on in SOSA itself. The Alien Tort Statute initially came about not because of concerns. I think Judge Klinefeld's question was what sort of rule should we adopt, which leads you to the question of when are extraterritorial acts within the jurisdiction? Well, I guess extraterritorial acts. Our first order of submission, again, Judge Reinhart, with respect, is that extraterritoriality doesn't come within the fold of the statute in the first place. But based on the more limited rule that we're putting forward today, extraterritorial conduct could come within the fold of the Alien Tort Statute if it didn't involve a foreign company, foreign government, foreign citizens, and foreign soil. So if it involved not one of those, for example, if it involved a United States company or if it involved foreign officials who are found in United States territory and where the allegations involve evidence and witnesses that are located here because the foreign officials have come here and it's involved a U.S. company. Don't we have a foreign company that has a presence in the United States? Let me ask you this. Sure. How does this really differ from Doe v. Unocal? Well, first of all, I don't know that the court has to accept what Doe v. Unocal stood for, obviously, because this is the en banc court. But Doe v. Unocal I think at least involved a United States corporation. Because it's what? Just because it's the en banc court. My point is simply, Your Honor. I can't hear what you're saying. Because you're sitting at an en banc court. I guess my point is simply that Doe v. Unocal wouldn't necessarily be binding on this court as sitting as an en banc court. But in terms of what's different about it. So you're saying we should overrule Doe v. Unocal? No. No. I don't think you would need to for purposes of this submission, Your Honor. No, no. Doe v. Unocal, you know, that's the law in many jurisdictions in this country. Well, it didn't – Doe v. Unocal didn't involve a foreign corporation, Your Honor. And so at least you'd have that situation. There's no nexus in the circumstances of this case because the defendants are a foreign corporation. That's why. And you say that the United States has no great interest in what's going on in Bougainville? Well, it doesn't have the same degree – it certainly doesn't have the same degree of interest as it would. We lost something like 1,500 lives during the Second World War there. And the people who are being exploited now were on our side and made great sacrifices. And we still have graves there. So we have no interest in what goes on in Bougainville? Well, with respect, Judge Ferguson, I think the question for the Court is what the degree of the United States' interest is vis-à-vis the allegations in this case. And vis-à-vis the allegations in this case, they involve claims against a foreign corporation based on its association with the Papua New Guinea government. So the argument you're making sounds an awful lot like a foreign nonconvenience argument. Beyond that, what is it? Well, it's about when Federal common law should be created to govern this situation. It's not foreign nonconvenience, Your Honor. It's an antecedent question about whether Federal common law should reach this in the first place. And I think that's what the Supreme Court was looking to specifically at pages 727 and 728 of its opinion in SOSA, where the Court said that lower courts should recognize causes of action, if at all, only with great caution in this sort of circumstance. And what it pointed to as a citation for that was Judge Borg's statement in the Tell Oren opinion concerning whether it's ever proper to recognize action in Syria. I'm sorry. What you're arguing would essentially wash out any universal jurisdiction concept. Is that right? It would wash out any? Yes. Because, I mean, as I understand the universal jurisdiction concept is that there are a very, very small number of cases as to which you – these territorial considerations don't apply in international law. Right. As a matter of international law. And you're suggesting that despite that general rule, it not – would not apply under the Alientoric Claims Act. Right. Because I think as the Perali opinion correctly concluded, just because universal jurisdiction might be exercised as a matter of international law doesn't mean that it should. And the question is, in the absence of any congressional direction about whether courts are supposed to reach out and resolve disputes in this sort of situation, courts should create a common law cause of action that does so. It would, of course, be one thing if Congress supplied a cause of action that did address this sort of situation, as it did, for example, in the Torture Victims Protection Act. But in the absence of a congressional cause of action, the question is whether courts should fashion a common law cause of action that encompasses this sort of situation. I didn't get your answer to the – to the question about the fact that Rio Tinto has a presence in the United States. What's your response to that? Rio Tinto – Your Honor, the Rio Tinto group has interaction with the United States, but those – that manner of presence has nothing to do with the basis of this suit. And it's never been thought in international law that just because a company or a person has a presence in a jurisdiction, that that's sufficient to give rise to the sort of nexus that would enable adjudication of a dispute that involves something entirely different. But I thought you said that was the difference between this case and UNICAL, Doe v. UNICAL, that UNICAL had a presence here in the United States. Oh, yes, Judge Allison. I think there's a – there's a difference in international law between circumstances in which the defendant is a national of the country where the case is brought and circumstances in which the defendant is not a national of the company where the case is brought. And this – and in this case, the defendant is not a national of the United States. But in UNICAL, the defendant was a national of the United States. Is one of the plaintiffs a long-term permanent resident of this country? One of the plaintiffs is alleged to be a permanent resident of this country in the complaint. Would that make a difference in your argument that there is no nexus with the United States? It wouldn't, Your Honor, because it's – the plaintiff, by definition, isn't a United States national. He's an alien. Of course, he has to be in order to bring an action under the Alien Torch statute. Can he also allege that his people who – and his family who were killed were United States citizens?  Didn't he also allege that he was suing on behalf of people in his family who were killed who were United States citizens? Well, he's married to a United States citizen, Your Honor. I'm sorry? He's married to – I think he's – He's a resident, but he also sued, as I understand it, for the loss of members of his family who were American citizens. Is that not so? I don't – I don't know that the member of his family who was lost to a United States citizen. I think he's married to a United States citizen. But – and I should say, Your Honor, on that score, my understanding, and this would have to be something that would be worked out in the proceedings on remand in the district court, is that that individual, the lead plaintiff, Mr. Sarai, is now a member of the Bougainville legislature. And so I don't know that it's still the case, and I think perhaps plaintiff's counsel can clarify this. I don't know if it's still the case that he's a resident of the United States. It may be that he's a resident of Papua New Guinea. That's something that we want to elaborate on. I had a question, and I'm not sure. Someone else is going to argue on certain other things, or – are you handling all the argument on this side?  My question is, you've raised a number of arguments. But if, for example, that we were not to accept your arguments on the corporation or extraterritoriality or any of those, do you differentiate between the genocide and the torture crimes and racial discrimination? Because my understanding is the district court originally held that your racial – that the racial discrimination claim could only be brought against a state actor. But use 1983's color of law analysis to permit the claim against Rio Tinto. And then the three-butt judge panel found that the racial discrimination rose to the level of Juice Kogan's violations of customary international law. Do you view the race discrimination as different from the genocide and the torture or – We do, Your Honor. I mean, if you don't prevail on the other issues, that's – No, we do. We think we should at least prevail on the race discrimination claims. We distinguish between those and, on one hand and on the other hand, crimes against humanity and war crimes, which are the other two at issue. Because race discrimination isn't universally accepted in international law as a violation of international law. It's something that's dealt with in the main by local law. I mean, are you in the 21st – It only arises – Are you in the 21st century? Am I in the 21st century now? Yes, Your Honor. That's a yes or a no. I am. I am. Now, with respect to – and I don't – if Your Honor's questions about – I don't understand something about your argument. If I understand your argument correctly, you are advocating a position narrower than the one that the United States advocates, instead of just marrying the United States position. Now, you don't need a position as broad as what the United States advocates in order to prevail in your particular case. I understand that. What I do not understand is, do you disagree with the United States position, or are you just withdrawing from it because you don't need that much breadth? The latter, Your Honor. We agree with the United States position. We think the presumption against extraterritoriality does apply in this case, and we think the implication of the presumption against extraterritoriality is that the Alien Torch Statute doesn't reach extraterritorially at all. But our position – What we could do in this case, as far as you're concerned, is just go with what the Supreme Court decided in 2010 in this Australia bank case and leave it at that. Right. You could do that, Your Honor, and that would certainly resolve this case. But you wouldn't have to do that. You could do something narrower, which I think is what the Supreme Court – If we wanted to. If you wanted to. So you don't see anything wrong, then, with us just going with the Supreme Court position in the great Australia bank case? We don't see anything wrong with it, Your Honor. But this gets to a further response I'd like to make to a question that was asked earlier, which is whether there's any way to draw a distinction between the rule that we're putting forward today as opposed to the broader rule that the United States supports and other situations in which universal jurisdiction might allow a claim to be brought here. And one potential example of that is the Marcos case. Yes. Because our rule deals with circumstances in which the claim calls into question the actions of a foreign sovereign. And I think the Court could reach the conclusion that that wasn't the case in Marcos because under the way that the Ninth Circuit itself, this Court itself, described the circumstances in Marcos, Marcos was not carrying out official responsibility when he was engaged in – he and she, depending on which case you're looking at, was engaged in the actions they gave rise to the claim. And so when you're not – Well, is that to your – at all what you're saying? You're saying that the line between this and the reason why you would not be eliminating universal jurisdiction is what? Well, because, for example, in the Marcos case, we wouldn't take out – our narrower rule wouldn't eliminate the Marcos case from the can of cases that could be brought under the Alien Tort Statute. Because? And the reason is that as the Court explained at 498 of its opinion, she has admitted that she was acting on her own authority, not the authority of the Republic of the Philippines. So they didn't count as public assets. So then you're washing out – you're essentially differentiating based on whether there is a private – it gets to the fact that here Rio Tinto was alleged to have been in – jointly acting with the government of Papua New Guinea. What does that have to do with the extraterritoriality issue? It has to do with it because the can – the particular category of extraterritorial claims we're talking about is claims where a foreign company is acting in association with a foreign government's treatment of its own citizens on its own soil. So we're talking about official foreign government actions, and that's what's in the complaint in this case. It's the prosecution of a war by the government of Papua New Guinea. I don't think that the – Well, let me go to that because it kind of takes us back to the district court's original decision in which she dismissed count one and two, the genocide and the war crimes, on the basis of political question. But it seems to me, in light of the U.S. statement of interest and the timing, that what we think of as a classic political question doesn't still exist. What about active state? Because now you're talking about the distinction, in Judge Berzon's question, between a private individual and a state action. So if we don't buy your extraterritoriality argument, where does that leave you, or your corporate argument? Well, if you don't – first of all, we don't abandon our active state argument, Your Honor. And there's a couple pieces to the question you're asking, if I understand it. One is, how does our argument on extraterritoriality, the narrower principle that we would put forward, differ from active state? If that's part of your question, I'm happy to engage that. Well, there's not a – I assume there's not some kind of active state exemption or exception. So how does it fit in if the extraterritoriality argument does not erase liability here? I really want to focus on counts one and two, which are two of the claims the district court left as not needed to be exhausted. So if you would focus on those two and tell us what the position is on those as to the basis to sustain the ruling on the motion to dismiss. Well, it would be sustained on the extraterritoriality ground that we're putting forward. I know. I already told everyone to talk about that. Okay. Oh, you don't – okay. I said leave that aside. Sure. Leave aside corporation.  Then exhaustion. The third principle we've put forward is that at least in the circumstances of this case, there should be an exhaustion requirement. And as I understand the plurality's approach, the plurality says that in circumstances involving a weak nexus and universal jurisdiction, there still needs to be a threshold inquiry about whether exhaustion should be applied in the circumstances of a particular case. Let's assume we call the district court and say, well, no exhaustion required on these. These are the kind of claims that certainly fall within the discretion to exclude prudential exhaustion. Where does that leave you? Well, I guess you're taking out all the arrows in my clipper, and I guess one by one, and I guess that leaves active State. I'm sorry? That leaves the active State doctrine. We're not abandoning the active State doctrine, but I think – Okay. Talk about it then. Instead of rolling off all these claims, I want to get to some of the meat of your argument. How does the active State apply to counts one and two? Counts one and two being the – The genocide and the war crime. Well, the allegations in the complaint call into question the official actions of Papua New Guinea in prosecuting a war, and it calls into question their actions in their own territory. And so the threshold conditions for application of the active State doctrine would apply. The other circumstances that the Supreme Court announced in Sabatino concern whether the particular circumstances are unlikely to give rise to foreign relation concerns and whether there's been a change in government and whether you're dealing with a universally accepted principle. And with respect at least to the first two of those, we would continue to put forward the submission that you're not dealing with a change in government because there hasn't been, for example, a revelation or anything of that sort. And the circumstances do still give rise to foreign relations concerns. And I think part of that – Well, if the relevant people say it doesn't, I mean, meaning the United States Government, the Papua New Guinea Government, and the Bougainville Government don't have any concerns left, then why do we have any concerns left? Well, I don't think – I don't think the United States doesn't have any concerns left, Your Honor. What the United States has said is that it doesn't have case-specific concerns of the type that would give rise to case-specific governance. Yes, it says that. But it still has foreign relations concerns with adjudicating this lawsuit. I think that's the position that the United States took in its own bank briefing. And the reason it said so is that in a case like this in which one of the considerations is that involves a foreign company, you have foreign relations friction potentially with the nation of which that company is a national. And that's manifested in this case because you have continuing objections lodged by the United Kingdom and Australia. Pardon me, Counsel. Should we even consider what the reply brief said about the foreign relations change of heart of the United States Government? It's not on the record. It hasn't – it hasn't been elaborated on in the record, Your Honor. At least the district court hasn't pronounced upon it. So that's the state of the record now. I can't remember whether I saw it in the record. I remember something in the briefs about how there's now this delicate compromise in Bougainville with autonomy but not secession and separate body of some sort governing. Is that right? That's the current state of affairs, Your Honor. I think it's – the plan, the hope is that there is a development towards a resolution of this in 2015 to 2020, somewhere in that time frame. I don't think it's happened yet. At this point, you have an autonomous region in Bougainville which has some features of a Federal system but not complete features of a Federal system. So that's the state of affairs there as far as I understand it. But, Your Honor, I don't want to – I don't want to give in too easily, if I might, on the question of – if we take the money from the mine and bring it over to the U.S. and give it to the class, we don't know if that would be okay with the Bougainville government or not. Well, yeah. First of all, the relevant government is the government of Papua New Guinea because that's the government that the United States recognizes. Bougainville is an autonomous region within Papua New Guinea that doesn't have its own international status vis-à-vis the United States. So at least that's – This isn't like East Timor then. Right. It's not a separate government. It's part of the Papua New Guinea government. Now, I don't want to give in too easily, though, on the notion of whether exhaustion should apply in the circumstances of this case. And if I might just at least elaborate on the argument why we think exhaustion should be applied in the circumstances of this case. There's a strong thumb on the side of the scale of exhaustion because of the exhaustion requirement in the Torture Victims Protection Act. Well, if we – on this argument, we would have to, though, revisit the last Rio Tinto to accept your argument on exhaustion, right? I mean, there was – you know, the last en banc opinion, there were individuals that said that they think that it was mandatory exhaustion. But the majority or the plurality opinion says it was prudential. Prudential. And I mean to address the prudential argument. I'm saying under the prudential argument that you would engage in a case-by-case inquiry whether to apply exhaustion in the circumstances of a particular case. We think exhaustion should be applied in the circumstances of this case. Now, I asked you last time, or I asked you whether it was standing up last time, I don't remember who it was, whether you really mean exhaustion in a primary jurisdiction sense or whether you mean that they should go to Papua New Guinea and that the result in Papua New Guinea would be binding. And the answer was that it would be binding. Is that still your answer? It very well could be binding, Your Honor. I guess what I mean by exhaustion is the same exhaustion. It's called exhaustion in the Torture Victims Protection Act. And I mean exhaustion in that sense, which is exhaustion in the international law sense. It's what Congress codified in the Torture Victims Protection Act. And it's the same sort of regime that we would envision operating here. So it's essentially saying go litigate over there. Go litigate over there. And if there's a judgment over there, and if there is no basis for declining to give effect to that judgment here, then, yes, that judgment would govern. And that's exactly the regime that governs in the precisely analogous context of the Torture Victims Protection Act. So are you re-arguing mandatory exhaustion, or are you just taking the position that we should reverse because prudential exhaustion would have required exhaustion? No. I don't mean to be re-arguing mandatory exhaustion, Your Honor. I'm engaging the plurality. But what did the district court do wrong? What the district court did wrong is it assumed that simply because this case involves universal jurisdiction, ergo exhaustion doesn't apply. And that, in our view, is not consistent with the framework laid out by the plurality opinion. Instead, what the district court was supposed to do is consider what particular facts and circumstances in this case, even though it involves universal jurisdiction, would counsel in favor or against the application of an exhaustion requirement. Do you think that we review the prudential exhaustion decision on an abuse of discretion or de novo standard? As a general matter, you would review it under an abuse of discretion standard, Your Honor. Of course, if there's an error of law, and we think that does count as an error of law, that would constitute an abuse of discretion, because we don't read the plurality to have concluded that simply because it involves universal jurisdiction, it necessarily means there's no exhaustion. And there are particular circumstances. Yeah. What did the three-judge panel do about exhaustion? The three-judge panel of this Court? Yeah. In the first instance, there was no exhaustion requirement. But on the on-bank proceedings, the plurality and two other judges indicated that, at the very least, exhaustion should be considered on the facts and circumstances of this case. And there are three considerations I point to in particular as to why on the facts of this case, not in every case, but in this case, exhaustion should be applied. Well, where was the district court wrong, not the three, the original three-judge panel wrong, when it concluded that exhaustion wasn't required? Well, I take it the question before the Court now is what to do with the on-bank opinion's resolution of exhaustion, since that superseded the three-judge panel opinion that simply ceases to exist because of the on-bank review? Well, I think it's, you know, look, this thing has been around for how many years? It's been around for over the years. Eight years? Several years. That's pretty exhausting. You might say. But, you know, everything's wide open here today. You just said that yourself. So, I mean, I like the three-judge panel's decision. I want you to tell me what's wrong with it. Well, there are several things wrong with it, Your Honor. First of all, I don't think it gave adequate weight to the fact that Congress imposed an exhaustion requirement in the Torture Victims Protection Act, because if that's the most directly analogous context, and it gives rise to some real anomalies vis-a-vis exhaustion, because a United States citizen can bring a torture claim under the Torture Victims Protection Act, and he or she would have to exhaust. But under the view of the district court, an alien brings a claim alleging torture under the Alien Tort Statute, and he or she would not have to exhaust. And so we think that for that reason, a thumb should be on the side of the scale of exhaustion. Now, the specific considerations in this case that weigh in favor of an exhaustion requirement are that this case involves. Okay. Thank you, Your Honor. I'll reserve the balance of my time after just filling out these considerations if I might. The specific considerations are that this case involves no nexus with the United States, not just a weak nexus, but no nexus because you're dealing with a foreign company. It also involves a circumstance in which you're dealing with the acts of a foreign sovereign, unlike, for example, the circumstances in Marcos, the official acts of a foreign sovereign. And the third consideration is that it's not a situation in which you have a claimant who's here and potentially a defendant who's here where you can take facts and evidence here. All the facts and evidence and witnesses are in Papua New Guinea. It's very much like it is essentially a foreign nonconvenience argument. Once you get to prudential exhaustion, the difference between a foreign nonconvenience argument and the considerations, and given the fact that you are – the kind of exhaustion you're talking about is not simply primary jurisdiction but preclusive in most instances, there's no functional difference between what you're – a prudential exhaustion argument and a foreign nonconvenience argument, is there? Well, Your Honor, I guess what I would say is this, that under the Torture Prevention Protection Act, presumably there's also foreign nonconvenience objections available, but there's also an exhaustion requirement. I mean, I understand you're calling them different things, but in fact, what's the difference? Well, the foreign nonconvenience doctrine is more – is inherently discretionary. I guess it's inherently discretionary also because that's what we said in the last go-round. They are largely overlapping, Your Honor. They are. But at international – I guess one – I guess there's a lot of – Isn't the difference international law? Right. At international law, there is an exhaustion requirement. And so what we're asking is for the Court to recognize that that international law principle should at least place a thumb on the side of the scale of exhaustion. Well, I understand that, but I meant in terms of the factors. And we know that this district court refused foreign nonconvenience earlier, and in part because the individuals were saying they couldn't go back to Papua New Guinea without danger. Well, I think one difference, Your Honor, is this, that foreign nonconvenience typically doesn't turn on considerations such as whether it's likely to impair the foreign relations.   And I think that's what we're asking for in the specific matter at hand. Exhaustion in this context implicates broader principles about what are the circumstances that are likely to give rise to international friction. You have only a minute left. And the United States, the United Kingdom and Australia think there should be an exhaustion requirement. It does raise foreign relations concerns. And I would reserve the balance of – the limited balance of my time. Thank you. May it please the Court, Steve Berman on behalf of the plaintiffs. And let me begin, because the case has been going on for so long, my third appellate argument in this case, reminding the Court what it is we're asking the Court to do. First is to reverse the dismissal of the war crimes and crimes against humanity claims on political question grounds. And to reverse the dismissal of the racial discrimination claim on active state and comity grounds. And second, to affirm the district court's application of the prudential exhaustion requirement. And let me start with prudential – Can I just ask in terms of positioning? Suppose we did all that. Then we get – then do we get to the basic questions of whether there are causes of action here, either with regard to the war crimes, the crimes against humanity, the racial discrimination claim, aiding and abetting, whether a corporate defendant – do we get to all that? Or what do we do with them all? Well, I think that you don't need to get to those, because they weren't properly raised. As to corporate liability, Rio admitted in the district court that if we allege sufficient state action and sufficient control, there was corporate liability as a matter of law.   And if we allege sufficient state action and sufficient control, there was corporate liability as a matter of law. Well, but there was an argument made below that there wasn't. I mean, if you – there's a lot of briefs and a lot of ink spilled in this case. But there was an argument about corporate liability made. They did not appeal that. They appealed one question. They don't need to. I mean, that's why I think they don't need to appeal. I mean, they won a dismissal first time out. You don't need to appeal if it could be sustained on other grounds. So that's – maybe we're just talking past each other. Just assume that it's in the case. And it may or may not be. We have to figure all that out. But just assume it's in the case. If you think it's in the case, then I think you have two options. One, you can remand to the district court and say, we're not reaching the corporate liability issue in our opinion, although it was reached in the panel opinion. And you need to decide that issue. Or you can decide it. Either way. But we – so turning to potential exhaustion. Start. I agree with my living colleague that the SOSA court directed courts to be vigilant gatekeepers. Let me ask you about that gatekeeping. There's a case that – it's kind of recent, so it hasn't been as chewed over as most of the others. But it's a United States Supreme Court case. We're obligated to follow it. Morrison v. National Australia Bank came out June of this year. And it says, it is a longstanding principle of American law that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States. Then I look at the Alien Tort Statute. Not only doesn't the contrary intention otherwise appear, but also the timing in 1789, I think it was, and the context responding to the – I think it was an assault on a consul in Philadelphia and an arrest of a consul in New York, indicate that it was indeed meant to apply within the territorial jurisdiction of the United States to act by Americans that could cause our new country to land on the wrong side of a diplomatic dispute with other powerful, more powerful nations. And when you look at Blackstone's list that's quoted in SOSA, that's what it's about. It's, as SOSA itself says, to preserve the peace among nations by giving foreign nations a remedy in United States courts for violations of the law of nations that take place within the American jurisdiction. Kennedy. Even piracy was committed by Americans in ways that could cause international incidents that could endanger our security. I think the amiable Nancy came out of one of those in the 1820s. Why aren't we just bound to apply this language in Morrison and leave it at that? Because Morrison involves a domestic statute which deals with laws affecting the United States. When you say domestic, I don't understand the adjective. They're both laws passed by Congress. Neither of them says one way or the other whether they apply to foreign companies or foreign individuals in foreign lands. Well, the SOSA court itself, Your Honor, the SOSA court itself says that the ATS, the statute we're addressing, was to address, and I quote from the opinion at 542 U.S. 714, was to address, quote, conduct situated outside the domestic borders. And the reason SOSA doesn't do that. 714, did it say? Yes, 714. And that's consistent with the notion that the high seas wouldn't necessarily be within domestic borders, for example, for piracy, correct? That's correct. And in addition, the SOSA court. I'm quoting from 714. The context doesn't look right to me. Well, I'll find the quote in the exact page and I'll come back to you. The context of what you say and what they're talking about, it looks like two different things. Well, no, I respectfully disagree. Just show me. That's all. I'm willing to be educated. They also endorsed the Florida, Florida, Marcos and Toleran cases. All of those cases, let's take Philardega. Philardega involved a Paraguayan citizen, acts in Paraguay. The Supreme Court in SOSA says we approve of the Philardega line of cases. No conduct in the United States. The Supreme Court endorsed this Court's decision in Marcos. No conduct in the United States. The Supreme Court suggested an exact. Where did they endorse Philardega? I thought that they quoted it, but I didn't see anything saying I approve of, we approve Philardega. Were you just saying generally? They say that our holding, and they said it's in several cases, is consistent with the long line of cases interpreting the ATS. And then they string cite all those cases. So you're reading that as saying that they approve of that line of reasoning? I do. And Justice Scalia, in his dissent, actually goes on to say that he disagrees with the plurality because they've endorsed, he uses that word, quote, endorsed this line of cases, which he disagrees with. Well, what about the narrow proposition that we heard for the, I think, the first time today with regard to, as I understand the argument, that without simply importing a general presumption against extraterritoriality, that in shaping the causes of action under the Alien Tort Claims Statute, we ought to carve out some set of cases in which the nexus to the United States is extremely weak, if not not, although not in this instance, non-existent. Okay. And that gets, I think, back to the prudential balancing test that Judge Morrow did, and let me answer your question by examining what she did. I mean, you instructed her to consider three different things. One was universal concern, one was comedy, and one was nexus. And let me take them one by one. As to universal concern, Judge Morrow had before her a universal concern that what I would characterize going to a red alert level, hardly ever seen in an ATS case. What do I mean by red alert level? The evidence on the record before her affidavits from the former commanding general of the Papua New Guinea Defense Forces. Red alert means the enemy is on its way. Well, maybe I used a bad analogy and say highest level. Churchill used that expression in the 30s. And the reason I say that is what the judge had before her in balancing is evidence that Rio Tinto directed the Papua New Guinea Defense Forces to use any force necessary even if it meant killing. Rio Tinto then supplied the gunships, the troop transports, the barracks, the ammunition, a command post, helicopters, and they flew the planes. They then instructed that a blockade be initiated and maintained. And the commanding general has said in his affidavit, without Rio's assistance, we couldn't have done combat operations. So she didn't just... But combat operations do not violate the law of war or create crimes against humanity just by themselves. Against another civilian population, which is whether the allegations, for example, take the race decision. Did President Lincoln do just that? Excuse me? Didn't President Lincoln do just that to the southern states? Institute a blockade? He may have. Is that a war crime? I'm not here to judge his act. But possible violation of the law of nations to avoid the question of even whether a violation of the law of nations is alleged. Forcible taking of slaves by violence against civilian populations. Taking and selling of slaves in international commerce. No question that's a violation of the law of nations. It happens every day now in the Sudan. Can a Sudanese who's managed to escape these hollers and manages to get to San Francisco bring a class action so that we will send marshals in to enforce an injunction against that slave trade in the Sudan? Well, I think that that plaintiff would be subject to the same balancing test that you've asked Judge Morrill to do. So you wouldn't say no jurisdiction. You would say balancing test. I would say, well, first of all, you have to get jurisdiction, personal jurisdiction over the defendant. And we're able to do that here because Rio Tinto... We've got a Sudanese who's living in San Francisco. But he's got to get the defendant. He's got to get the defendants here as well. And we're able to get this... So if they have bank accounts here, let's pause it. If the defendant had a bank account, that probably would not be enough to get personal jurisdiction. I don't know. I'd have to go through the personal jurisdiction. They probably promote tourism here. Like in Kaseer, the case we had about the Nazi stealing stolen Pesaro painting. They might very well do some tourism promotion here. Well, I think they would be subject to the same test we have here. Here we have high universal concern. We have no comedy concerns because the government of Papua New Guinea and the autonomous government of Boulderville have time and time again asked the court to let the case proceed. And we have nexus. We have nexus in two forms. As you correctly pointed out, the plaintiff is a resident. Is that in the record both governments want us to proceed? Yes. It's in an excerpt we actually got finally from the State Department after years of trying, all the letters, and the letters are in a submission we made to this court. Do the plaintiffs have a remedy in Papua New Guinea? I do not believe they have an adequate remedy in Papua New Guinea. I believe they have a remedy in Papua New Guinea, but Judge Moore ruled against us on that aspect of the Foreign Nonconvenience case. But at the time that we filed the case, we didn't consider the adequacy of the remedy because the war was still going on. My clients, there was a bounty on their heads. In order for them to meet me, I actually had to sneak them out of the country and meet in Australia. So they weren't willing to subject themselves to personal danger to go file the lawsuit in Papua New Guinea. I guess what I'm asking, could they get a judgment against Rio Tinto in Papua New Guinea? Rio Tinto actually isn't located in Papua New Guinea. I know, but they have assets there. They have assets there. Okay. Could they get a judgment against Rio Tinto in Papua New Guinea and enforce it in Papua New Guinea? I don't know the answer to that. I'm not an expert on Papua New Guinea law. But turning back to why I think this case is properly here, you raised the question about the plaintiff's status. So we have a corporation, a multinational corporation. Forty-seven percent of its assets are here. The Flatterguy case said we have an interest in enforcing Juice Kogan's norms, and we have a defendant that can be found here that's alleged to violate those norms. In addition, the plaintiff at the time this lawsuit was filed was a resident of the United States. His wife is a resident of the United States. And they brought a claim on behalf of their son who was killed in this war. That's a strong nexus. That makes it a little bit different than the hypothetical that you gave me, Judge Klinefeld. And weren't the wife and son United States citizens are alleged to be? They're alleged to be, yes. Yes. So for all those reasons, I'm not going to ---- How is it different? How is it different is that we have your hypothetical was we have a Sudanese who is lucky enough to escape the slave trade and comes to San Francisco. We have a plaintiff who's not escaping. He lives here. He resides here. His wife resides here. They're U.S. citizens. Their U.S. citizen son was killed. I think that's different than your hypothetical. Well, what's difficult to add with that argument is that it removes the alien from the alien tort claims or the alien tort statute. That's right. I think we're kind of shifting ground about the national and international considerations when you go down that path. Maybe I'm wrong. Well, he was a resident citizen, and I think he qualifies as an alien. That's correct. But the whole discussion about what his wife or child or whatever, does that matter? That's my question. Well, I think it matters. He's a resident alien. He can bring this case clearly. That's right. Under at least the alien portion of the statute. That's right. And I think it matters somewhat that he's here, and he's within the umbrella of the United States, and the United States should have an interest in allowing someone who's here to prosecute the suit of this gravity. So I think that if you were concerned. Was the wrong committed against anybody who was a U.S. citizen when the wrong was committed? Not that I'm aware of. I was thinking the last, when our executive branch was excited about imperialism, they used remember the Maine as a slogan, and there it was an offense against U.S. citizens. Here, I gather, it's an offense entirely against foreigners. Is that true? Except for one of the plaintiffs, Surat, who is a resident. Was he an American legal permanent resident at the time, or was he a resident of Papua New Guinea at the time? He was a resident of the United States, a resident alien, who went back and forth, as he does now, to Bougainville. And it was on one of those visits, when he was with his wife and son, that his son was killed. So the answer to the question is that there was an American citizen who was killed, the son? Yes. What is your best argument that racial discrimination falls into the same category as war crimes and genocide, when you're doing the juice coke analysis? Well, the authorities that we've cited in our brief, the authorities that the three-judge panel relied on, all recognize that in the 21st century, racial discrimination is juice coke. Any racial discrimination? Well, it has to be the standards that are articulated in the loose statement. And we allege a widespread practice of, A, discriminating based on pay, B, discriminating in terms of because they believe these people were black and inferior, they discriminate. Well, but they seem sort of like employment cases. So are in, you know, how people, employment cases, Title VII cases, are those, is that, does that rise to a level of juice cojones? No, because we allege a systematic attack, race-wise, on a civilian population. What we allege is because they viewed these citizens as inferior because of their race, they disregarded every norm of behavior that you would associate in a civilized world. They destroyed their land. They destroyed their property. They destroyed their tribal customs. They would not have done that to white people. Rio Tinto has never challenged the sufficiency of the racial discrimination allegations. They didn't appeal that whatsoever. So those should be sustained. Counsel, what's your response to opposing counsel's reliance on the recent Second Circuit case? And that goes to the issue of corporate liability, Your Honor. I'd be glad to address that. The Court has to make... I followed up, incidentally, on your response to my question about the Supreme Court decision in the Australian bank case. Your response was that SOSA made it clear that international law applied in the alien tort claim statute, but the material that you cited did not support what you said. The material you cited said that as part of our reception of international law, we received the international commercial law on such things as, oh, they use these admiralty terms for the sort of insurance that applies to ships that are sunk, general average and that sort of thing. That was reception of the law. It was not jurisdiction over foreigners in foreign countries, foreign governments doing things to foreign victims. So my answer, again, is the following. The SOSA court itself said in a footnote that you relied upon to impose the prudential exhaustion test that exhaustion might be appropriate in certain circumstances. Why would they have said that? Because if it didn't apply extraterritorially... Well, I wasn't limiting my question to exhaustion. I was addressing jurisdiction... I understand that. ...with regard to extraterritoriality. But there would be no need for the Court to ever consider whether you had to exhaust in a foreign country if the SOSA court contemplated that there was no extraterritorial application of ATS. They would have never needed to mention exhaustion. The United States urged the SOSA court to adopt no extraterritorial application, and the Supreme Court declined to do so. And, again, the Supreme Court... I think that they decided one way or the other. Didn't they just say we don't have to decide about that? I'm sorry, Your Honor, if you ask that question again. Didn't they just say we don't have to decide about that? What's the that? That's what I'm not following. Exhaustion? Yes. Well, since they said that they don't have to decide about exhaustion, inferring that they did decide would be an erroneous inference. And you can't get to the proposition that they're assuming extraterritoriality unless you make an assumption that they did decide. Well, my point, Judge, is that if they felt that you couldn't go outside the United States, acts committed outside were not part of this jurisprudence, there'd be no need to ever suggest an exhaustion test. And the facts of SOSA involve acts outside the United States, in Mexico. And, in addition, I don't... They didn't suggest it. Obviously, somebody else had suggested it to them, and they said we're not deciding. What did the pre-judge panel say about SOSA? And, Bing, could you answer my question? I'm trying to. And if you could restate it, because I lost it. I apologize, Judge Bronson. Well, you can answer Judge Fragerson's first. Okay. Judge Fragerson? He's senior to me, so... Judge Bronson asked what you thought about the Second Circuit decision about corporations. I think the Second Circuit decision about corporations is virtually unprecedented. All the courts that have... Does that make it wrong? No. I'm going to get to why it's wrong. It's wrong for two reasons. One would be a policy reason. Let me start with that. I think it would violate... I mean, a norm, an international norm, recognized under SOSA, is something that all nations have decided it's in human interest to not allow occur. So war crimes and crimes against humanity rise to that level. It would be setting back that very purpose that created the norm to say, okay, we're going to give a corporation, let's take Blackwater. Blackwater decides it's hired to exterminate an ethnic race in Iraq or Afghanistan. They do it. According to... So that's a norm. You can't do that. But according to the Second Circuit, you can't... They can... Well, you could still... But you still could... You would have jurisdiction over individuals in Blackwater that committed those acts. Right. Correct? The corporation would retain the profits. So they would benefit from a war crime. But that's not an argument to say that corporate liability therefore exists. I mean, if you look at international law, we've had the distinction between, of course, the State and private actors. And historically, there's not a situation where a corporation has been held liable in other countries with respect to international law, is there? Well, what Judge... Answer my question. Yes or no. Can you think of a situation outside of the United States under international law principles where a corporation has been held liable? I can't because generally the issue is whether corporations are going to be liable is not governed by international law. It's governed by domestic law. Well, that really, that kind of gets to the nub of the question, and that is how do you frame the international norm, right? I mean, is that a remedy within domestic law or is it somehow subsumed within? I think that our analysis is since the SOSA court, again, I urge you to see how they cite Flautiga and Justice Scalia's comment that they endorse the Flautiga line of cases. And what those cases say is first you establish the norm. And the norm here, what's been established in this case, then it's a matter of domestic law how a nation chooses to enforce that law. Some nations don't allow it to be enforced at all. Ours does. Who you can enforce it against is a matter, we submit, of domestic law. Why is that the adding and abetting question? First of all, do you think the adding and abetting question is here now, i.e., whether I... No. Because? Because it wasn't raised on appeal and it doesn't go to the Court's jurisdiction. But if it is here and you want to decide it, even the Cheban case from the Second Circuit and the Nestle case, which found no corporate liability, both agreed that every single court in the world that's considered this has found adding and abetting. But I'm asking a slightly more conceptual question, which is, is adding, in terms of the conversation you were just having about where you look for the question of whether corporate, there's corporate liability, is the answer to the adding and abetting question on that level the same? I.e., do you look similarly to international versus domestic law as you would on the corporation's question, or could the answer to the two be different? My answer to that question is you look, again, to if there's a norm, how that norm is enforced, namely who can be sued, that is a question of domestic law unless the norm itself specifies. So there are some norms where you have to have State action, where the international community has said who you can sue. But isn't adding and abetting really a question of what's the norm, what is it you can or can't do? What you can't do is you can't commit a war crime. Who is responsible for that has generally been decided on looking at the law of that jurisdiction. But if you want to look to international law, as Judge Ilston pointed out in the Bilodeau decision, that under international law, generally the courts have said there's a distinction, the only distinction that we're going to make is between private action and State action, and therefore, once you've made that decision, all the courts have said that people who aid and abet as a matter of international law, dating all the way back to the Nuremberg cases. If you aid and abet, you are violated customary international law. Counsel, what was your second reason? Your first reason was a policy argument as to why we shouldn't find the Second Circuit decision persuasive. What's your second argument? My second argument is the one that I'm not getting through, but is that the Second Circuit erred because they looked not to domestic law, as we think the SOSA court instructs the Court to do, but they looked at international law, and in looking at international law, the Court also committed an error, because what the Second Circuit really says is if you look at all the tribunals, the criminal tribunals, they aren't focusing on corporate liability, and therefore, there is no corporate liability. Right. But doesn't that then defeat your argument in the sense that if you have to show that something – well, I think that Judge Cabranes was saying, if you have to show that it's customary international law, then the fact that all of the cases out there talked about criminal liability, then therefore, there is no customary international law that supports corporate liability. Well, as the – as the – But you just – so to prevail, you have to – the Court would have to accept that we should analyze this in terms of domestic law. Well, that's one way for me to prevail. The second way – But how – where do you find in customary international law support for holding corporations? I draw it from the authorities in the dissent in the Keeble case. Well, you know, I've been in the dissent many times, and I – people keep telling me, including my law clerks, that that doesn't mean that I can cite myself. I just have to continue, you know. Because you're alone doesn't make you wrong, but on the other hand, it does make – it does mean you're not controlling. Well, we'll see where that case goes, because that case overrules, apparently, two other Second Circuit cases, one involving human experimentation, where Pfizer was the defendant. It overrules the South African case. But see, I guess – I guess what I'm seeing here, though, is if customary international law is the standard to evaluate corporate liability, you can't show that. You would have to – we would have to apply domestic law in order for you to prevail on that argument. There's two sources of customary international law that I think are illustrative. Okay. First of all, they are all laid out in the dissent, and I invite you to read that. But in addition, there's a case of United States v. Crouch. It's a war crimes tribunal before the Nuremberg tribunals. It's cited in one of the amicus briefs. And there, although they did not charge I.G. Farben, because they only want to go after individuals, they held that where private individuals, and I'm quoting, including juristic persons, which are corporations, commit wrongful acts – I'm paraphrasing – they have violated international law. So as far back as the Nuremberg trials, when the issue has come up, people have said corporations are liable. So are you saying there's a distinction between a corporation being the primary tortfeasor versus a corporation just being vicariously liable for the acts of its employees? Is that the distinction you're making? Or is that a valid distinction? The distinction that the Second Circuit is making is that corporations can't be sued at all, whether they're aiding or abetting or primary violators. And they used the I.G. Farben case as one of their precedents. Even though I.G. Farben ran the slave labor camp producing buna-esque artificial rubber at Auschwitz, the United States decided that as a corporation it could not be liable and just prosecuted the individuals. I respectfully disagree. That's not what the United States decided. The United States chose not to prosecute the corporation because at that time international law in many countries only wanted individuals, not corporations, to be liable because of the criminal intent requirement. Well, it's not that they wanted. It's that it goes back to my earlier question that in the history of international law, we've never seen the prosecution or the suit against a corporation. And that then goes back to the earlier question of how can it be universal if it's never happened. Well, again, my answer to that is twofold. One, you don't look to international law. And two, the absence of people considering whether a corporation would be liable, it just hasn't come up. But a corporation is a person. Don't look at international law to decide what the law of nations is? Well, that gets back to the issue, Your Honor, of what fills the duress. And Judge McKeown touched on this in the plurality opinion. And she avoided the question because the commentators have said a lot of wasted words have been spent on this. But the issue is your time has expired. Well, I mean, you know, it seems to me that I'm trying to communicate with Dickens, but this would be a good case for him to use when he writes bleak house revisited. And this case has been going on and on and on and on. And it just strikes me that we ought to put it in some shape where we can send it up to the Supreme Court, because they're going to be making the final decision here. In the meantime, we have delays, delays. We have all these sophisticated arguments that you can go backwards and forwards on. And people are being abused. They're dying. They're working in enslaved conditions to dig gold and copper out of Bougainville. Well, fortunately, this argument came out. That's my view. That's my view. OK. And, you know, I really, really wish that those who sacrificed their lives on Bougainville could listen to this highly sophisticated discussion, which is apparently getting us nowhere. Your time has expired. Thank you. Thank you, Your Honor. I have very limited time. We'll give you two minutes. Thank you. I'd like to make one principal point, which is we certainly endorse the proposition that the Court should reach the issues of corporate liability and extraterritoriality. And I want to make one point on the question of corporate liability, which is this. We agree with Judge Cabranes and Judge LaValle, for that matter, that international law determines what the scope of corporate liability. But it's important to note that even if you thought that domestic law governed the question, we think that under domestic law, the answer still should be that there's no corporate liability, because the most salient analogs for purposes of domestic law are the Torture Victims Protection Act and Federal Common Law Causes of Action. But, you know, if a corporation abuses the law, if they abuse this privilege of limited liability, they lose it. Judge Fragerson, I think that's what the great Henry Winthrop Ballantyne taught me. You can go argue with him. Under the Torture Victims Protection Act, individuals, including American citizens, can't bring claims against corporations. They can only bring claims against natural persons. The same is true under business. Why is the most appropriate interest, therefore, the opposite, which is you have these two closely adjacent statutes and one has a limitation and the other one doesn't? Because the Alien Tort Statute under SOSIT is solely a jurisdictional statute. There was no reason to spell out the contours of the cause of action. That's not the case with the Torture Victims Protection Act. Thank you, Your Honor. Thank you. I'd like to thank both of you for your arguments. I thought you both did an excellent job of assisting the Court. Thank you. The case just argued is submitted for decision. The Court stands adjourned. All rise.
judges: Hearing Panel: Mahan, Fisher, Bybee, en Banc Panel: Schroeder, Pregerson, Reinhardt, Kleinfeld, Silverman, McKeown, Berzon, Rawlinson, Callahan, Bea, Ikuta